PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 1:20-CR-410 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| GIANNI GRAY, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF No. 22] |

Pending is Defendant Gianni Gray's Motion to Suppress. ECF No. 22. The Government filed a response in opposition. ECF No. 26. Defendant filed a reply. ECF No. 28. The Court did not hold a suppression hearing, as none was requested and Defendant's Motion turns on questions of law, but the Court did solicit argument on Defendant's Motion at the Final Pretrial Conference. *See* Minutes of Proceedings [non-document], December 17, 2020. Having fully considered the record and relevant law, the Court denies Defendant's Motion.

## I. Background

On July 14, 2018, two people were killed as they sat in a car at the intersection of West 117th and the I-90 Westbound exit ramp in Cleveland, Ohio. Cleveland Police, based on "[w]itness [s]tatements and[/]or [i]nvestigative materials," (ECF No. 26-1), suspected Defendant. On July 17, 2018, they filed a criminal complaint in Cleveland Municipal Court (ECF No. 26-2) charging Defendant with aggravated murder, and obtained an arrest warrant, which was signed by a deputy clerk of the Cleveland Municipal Court (ECF No. 26-1). Unable to locate

(1:20-CR-410)

Defendant, the Cleveland Police enlisted the assistance of the United States Marshals Service, resulting in a two-year manhunt across Ohio and Michigan by the Northern Ohio Violent Fugitive Task Force ("Task Force").

In April 2020, the Task Force received information from a confidential reliable informant, via the Cuyahoga County Sheriff's Department, that Defendant was at an address in Cleveland. Throughout the end of April and into early May, Task Force members surveilled the building believed to house Defendant. They connected the property to known associates of Defendant's and saw Defendant's girlfriend visit the building. They saw an individual matching Defendant's description leave the building in a Jaguar automobile and return. On May 5, Task Force members saw Defendant's girlfriend and son deliver food to the building and leave. Then a man who did not match Defendant's description arrived in the Jaguar and was let into the building by another individual, believed to be Defendant.

At this point, the Task Force made their move. They set up a perimeter and announced their presence. When no one answered the door, they breached it and made their way into the building. In a living area on the second floor, they found clothes and shoes consistent with Defendant's size, as well as two firearms—a rifle and a revolver. The firearms were immediately secured outside of the building. Eventually the Task Force members found Defendant and the man who had arrived in the Jaguar and arrested them. The Task Force members then performed a protective sweep of the building and found a third firearm, a semi-automatic pistol. Next, they searched the Jaguar and found $5,770 in cash, suspected heroin, and a gun box. When they re-searched the vehicle pursuant to a search warrant obtained a few days later, they found additional

2

suspected drugs, another firearm, ammunition, a cell phone, and a flash drive.  The building was also later re-searched pursuant to a search warrant, and the third firearm was seized during that search.

On August 13, 2020, the Government filed an Indictment charging Defendant with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  ECF No. 1.  Defendant was charged with the possession of the firearms found in the building, but not the firearm recovered from the Jaguar.

## II.  Discussion

In the instant Motion, Defendant argues that he was "arrested pursuant to an invalid . . . warrant and was subject to unconstitutional searches of his residence, person and automobile." ECF No. 22 at PageID #: 36.  Defendant's Motion raises the following questions: whether a warrant signed by a deputy clerk is invalid; whether the arrest warrant (ECF No. 26-1) was supported by an unconstitutional "bare bones" affidavit; whether the search of the Jaguar before the search warrant was obtained was unconstitutional; and whether the items obtained from the Jaguar pursuant to the search warrant should be excluded as "fruit of the poisonous tree."  ECF No. 22.

The Government argues that the arrest warrant was procedurally and substantively valid, and that even if the Court finds otherwise, the evidence at issue in this case should not be suppressed because the officers who executed the warrant relied on it in good faith.  ECF No. 26. The Government also raises the issue of whether Defendant has standing to object to the search of the building where he, and the firearms he is charged with possessing, were found.  *Id.* at

PageID #: 98.  Finally, the Government points out that Defendant is not charged with anything found in the Jaguar, and thus "it believes this issue is moot since no evidence found in the vehicle will be used during the Government's case-in-chief."  *Id.* at PageID #: 107.

### A. Standing

The Court takes up the issue of standing first because it is antecedent to the other issues. If Defendant lacks standing, his Motion must be denied.  Standing, in the Fourth Amendment context, requires a defendant to demonstrate that he has a legitimate expectation of privacy in the premises where he is arrested.  *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citing *Katz v. United States*, 389 U.S. 347 (1967)).  To do so, a defendant must show that they subjectively had that expectation, and that the expectation was objectively reasonable.  *Id.* at 95-96 (internal citations omitted); *see also Katz*, 389 U.S. at 361 ("[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'") (Harlan, J., concurring).  The Supreme Court has recognized that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."  *Minnesota v. Carter*, 525 U.S. 83, 90 (1998); *see also Olson*, 495 U.S. at 98.

Here, the Government's own papers establish that Defendant was at least an overnight guest in the building where he was arrested, and some portions suggest that the building was his home.  The Government mentions that Defendant was "staying at [the] building," (ECF No. 26 at PageID #: 88), that the "second floor appeared to be lived in" and "[t]here were male belongings in a closet with clothes and shoes consistent with [Defendant's] size" (*id.* at PageID #: 89 n.2).

(1:20-CR-410)

The Government even goes so far as to argue that "Marshals received information from a confidential reliable source that [Defendant] was residing at this location."  *Id.* at PageID #: 102.

Defendant, therefore, has standing to challenge the Task Force's entry into the building under the Supreme Court precedent cited above.  Although it is not entirely clear whether the building where Defendant was arrested was his home, or whether he was just an overnight guest there, the law is well-established that either way, both requirements for standing are met.  *Carter,* *525 U.S. at 90*; *see also* *Payton v. New York*, 445 U.S. 573, 582 n.17 (1980) ("At the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must by strictly circumscribed.").  Defendant did not "knowingly expose[] [the premises] to the public," *Katz*, 389 U.S. at 351, and his expectation of privacy in his residence is objectively reasonable. Defendant has standing to challenge his arrest.[1]

### B.  Warrant Signed by Deputy Clerk

Next, the Court considers whether the fact that the arrest warrant was signed by a deputy clerk of the Cleveland Municipal Court, as opposed to a judge, renders it invalid.  Defendant argues that this fact is fatal to the warrant's legality, because "when a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void ab initio."  ECF No. 22 at PageID #: 67.  The problem with Defendant's argument is that the deputy clerk who signed the search warrant did not lack the legal authority to issue the warrant.

---

[1]  Given that the Government does not intend to use the evidence found in the vehicle, the Court does not address the issue of Defendant's standing to challenge the search of the Jaguar vehicle.  The issue is moot.  *See infra*, II.E.

In *Shadwick v. City of Tampa*, the Supreme Court held that deputy clerks can constitutionally issue warrants. 407 U.S. 345 (1972). The deputy clerk need not be trained as a lawyer, and can even technically be an executive branch official; the only requirements for legally issuing a warrant are that the issuing officer be "neutral and detached" and "capable of determining whether probable cause exists." *Id.* at 350-51. The Ohio Supreme Court has reviewed and approved the Ohio statute authorizing deputy clerks to issue warrants as consistent with *Shadwick*'s requirements.[2] *State v. Fairbanks*, 289 N.E.2d 352, 357 (Ohio 1972). The Court agrees with the Ohio Supreme Court: under *Shadwick*, that the warrant for Defendant's arrest was signed by a deputy clerk of the Cleveland Municipal Court does not render it invalid.

**C.  Validity of the Warrant**

Whether or not the warrant for Defendant's arrest (ECF No. 26-1) requires the suppression of evidence obtained pursuant to its execution is another matter. The Court's analysis proceeds with the understanding that Defendant was arrested in his home. "[T]he Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton*, 445 U.S. at 576 (citations

---

[2]  The Ohio statute provides: "A peace officer who seeks to cause an arrest or prosecution under this section may file with a reviewing official *or the clerk of a court of record* an affidavit charging the offense committed." O.R.C. § 2935.09(C) (emphasis added); *see also* O.R.C. § 2935.10(A) ("Upon the filing of an affidavit as provided by [the previously cited section], if it charges the commission of a felony, such . . . clerk . . . unless he has reason to believe that it was not filed in good faith, or the claim is not meritorious, shall forthwith issue a warrant for the arrest of the person charged in the affidavit."); Ohio R. Crim. P. 4(A)(1).

omitted). The constitutionality of the arrest thus turns on the validity of the warrant. Whether the arresting officers independently had probable cause to arrest Defendant is irrelevant.

The validity of the warrant, *i.e.*, the constitutionality of the arrest, is not entirely dispositive of Defendant's Motion, however. In *United States v. Leon*, the Supreme Court provided that, "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." 468 U.S. 897, 906 (1984). *Leon* introduced what is commonly called the "good faith" exception to the exclusionary rule: "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," "[p]enalizing the officer for the magistrate's error [by suppressing evidence] cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 920-21. Thus, "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922.

*Leon* also provided guidance as to when evidence should be suppressed, *i.e.*, when courts should not find an arresting officer's reliance on the magistrate's determination of probable cause objectively reasonable. The example most relevant here is the Supreme Court's pronouncement that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. Such an affidavit has come to be known as a "bare bones" affidavit. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). Because suppression is only necessary

7

if the affidavit supporting the warrant was so deficient that the arresting officers could not have

relied on it in good faith, the Court "opt[s] not to decide whether the state [deputy clerk] properly

found probable cause for the warrant to arrest [Defendant]. . . . This case instead falls within

*Leon*'s heartland." *United States v. Baker*, 976 F.3d 636, 647-48 (6th Cir. 2020).  In other words,

the application of the exclusionary rule depends on whether the good faith exception applies, not

whether the deputy clerk correctly found probable cause for the issuance of the warrant.  Finally,

*Leon* dealt with a search warrant, and the warrant at issue in this case is an arrest warrant.  The

Sixth Circuit has squarely held, however, that *Leon* applies with equal force to arrest warrants.

*Id.* at 647.

The Sixth Circuit describes a "bare bones" affidavit as one that "asserts 'only the affiant's

belief that probable cause existed.'" *White*, 874 F.3d at 496 (quoting *United States v. Williams*,

224 F.3d 530, 533 (6th Cir. 2000)).  Such an affidavit is "'completely devoid' of facts to support

the affiant's judgment that probable cause exists." *Id.* (quoting *United States v. Carpenter*, 360

F.3d 591, 595-96 (6th Cir. 2004) (en banc)).  On the other hand, an affidavit that is not "bare

bones" must "include[] some modicum of evidence, even if only slight, connecting the criminal

activity at issue to the person to be seized." *Baker*, 976 F.3d at 648 (internal quotations omitted);

*see also United States v. Laughton*, 409 F.3d 744, 749 (6th Cir. 2005) (coining the "modicum of

evidence" standard).

Here, the affidavit does contain evidence connecting Defendant to the murders.  Similar

to the affidavit at issue in *United States v. Newsome*, the "arrest affidavit . . . states that someone

identified [Defendant] as the shooter," and "contained specific details about the shooting." 504

Fed. App'x 463, 465 (2012).  The affidavit describes the shooting as having occurred at precisely

"1924 hours," that it took place "at the location of W. 117th and I-90 West Bound exit ramp,"

and that the victims were killed "while they sat in a car."  ECF No. 26-1.  As in *Newsome*,

"[t]hose detailed observations confirm that the informant relied on firsthand knowledge, not

rumors, of the shooting."  504 Fed. App'x at 465 (quotation omitted).  The affidavit is not

"completely devoid" of facts establishing a nexus between Defendant and the murders.

*Carpenter*, 360 F.3d at 595.

As the Sixth Circuit has recently explained, the affidavit need not establish a "proper

nexus"; rather, it "will avoid the bare-bones label so long as it identifies a 'minimally sufficient'

nexus."  *United States v. Reed*, 993 F.3d 441, 450 (6th Cir. 2021).  "[T]he standard by which an

affidavit should be judged for purposes of the good faith exception 'is a less demanding showing

than the "substantial basis" threshold required to prove the existence of probable cause in the

first place.'"  *Laughton*, 409 F.3d at 748-49 (quoting *Carpenter*, 360 F.3d at 595).  Viewed in

light of this less demanding standard, the facts included in the affidavit sufficiently connect

Defendant to the murders for the Court to conclude that the officers' reliance on the warrant was

reasonable.

Additionally, suppression in this case would not serve the purposes of the exclusionary

rule.  First, even if the deputy clerk who issued the warrant made a mistake, the Court cannot

attribute that mistake to the police officers who sought or executed the warrant, and "[t]he

exclusionary rule was crafted to curb police rather than judicial misconduct."  *Herring v. United

States*, 555 U.S. 135, 142 (2009).  The exclusionary rule should only be applied when *police*

misconduct involved a "flagrant or deliberate violation of rights." *Id.* at 143 (quotation omitted).

At the Final Pretrial Conference, counsel for the Government pointed out that "the marshals

didn't consider it barebones or didn't consider it as anything alarming [because] this is a common

way that state court and county court do their affidavits."[3]  ECF No. 36 at PageID #: 161.  The

Court agrees that the fault for any errors in the procedures followed here belongs more to the

deputy clerk who issued the warrant than to the law enforcement officers who obtained and

executed it.  And the affidavit is not so lacking that it suggests that the law enforcement officers'

reliance on it "was flagrantly abusive of Fourth Amendment rights." *Herring*, 555 U.S. at 143

(quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)).

Furthermore, the Supreme Court instructs that "[w]hether the exclusionary sanction is

appropriately imposed in a particular case must be resolved by weighing the costs and benefits of

preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence

obtained in reliance on a . . . warrant issued by a detached and neutral magistrate that ultimately

is found to be defective." *Leon*, 468 U.S. at 906-07.  The benefit to be gained by exclusion is the

deterrence of possible future Fourth Amendment violations by police. *Herring*, 555 U.S. at 141.

"The principal cost of applying the rule is, of course, letting guilty and possibly dangerous

---

[3]  Indeed, there is a history of state and county courts in Ohio issuing warrants based on affidavits that are light on facts. *See, e.g.*, *Overton v. Ohio*, 534 U.S. 982 (2001) (statement of Breyer, J., respecting the denial of the petition for certiorari, joined by JJ. Stevens, O'Connor, and Souter); *Ohio v. Hoffman*, 25 N.E.3d 993 (Ohio 2014).  The affidavit at issue in the instant case contains enough facts to distinguish it from the affidavits at issue in *Overton* and *Hoffman*.  Those cases do, however, support the Government's point.

defendants go free." *Id.* "[T]he question," therefore, "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* at 137.

Under the facts of this case, the Court finds it difficult to see the deterrence value of suppression. Defendant's arrest warrant indicates that he killed two people, not that he was a felon in possession of firearms. It is doubtful that the suppression of evidence in an unrelated federal case would encourage the officers who obtained and executed the warrant to be more careful in their future investigations of violent state crimes. Granting Defendant's Motion in this case would have no legal impact on the state murder case for which the warrant in question was actually issued, and would, therefore, be unlikely to deter the officers investigating that case from using similar methods in the future. Suppression of the evidence in this case would exact all of the costs of the exclusionary rule—it would incur "a costly toll upon truth-seeking and law enforcement objectives," *id.* at 141—while failing to implicate any of the benefits. The Court, therefore, will not suppress the evidence obtained from the Task Force's entry into Defendant's home based on the arrest warrant issued by the Cleveland Municipal Court.

### D. Plain View

Defendant argues that the guns he is charged with possessing were improperly seized under the plain view doctrine—an exception to the general rule that an officer must have a warrant to seize personal property—because, given the alleged insufficiency of the arrest warrant, the officers were not legally present in Defendant's home when they seized the guns. ECF No. 28 at PageID #: 126 (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)). This argument lacks merit.

(1:20-CR-410)

In *United States v. Newsome*, police entered the defendant's home to execute an arrest warrant, and while there, they observed illegal drugs in plain view. [504 Fed. App'x at 466](). The defendant challenged the validity of the arrest warrant and the court passed on the question of whether the deputy clerk who issued the warrant in that case properly found probable cause, opting instead to hold that the officers executing the warrant did so in good faith. *[Id.]() at 465*. The officers obtained a search warrant before seizing the drugs, but the Sixth Circuit held that "the officers did not need a warrant to discover drugs in plain view" anyway, pursuant to *Maryland v. Buie*. *[Id.]() at 466* (citing [494 U.S. 325, 334 (1990)]()). "When police officers make an arrest inside a home, they may, 'as a precautionary measure and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *[Id.]()* (quoting [494 U.S. at 334]()).

That is exactly what happened here. Two of the firearms Defendant is charged with possessing were seized while the Task Force was in the process of finding and arresting Defendant within the building. The firearms were seized as a precautionary measure, in the interest of protecting the officers from possible attack while inside the building. The third firearm was observed during a protective sweep, and out of an abundance of caution, was not actually seized until a search warrant was obtained. As in *Newsome*, the Court need not hold that the arrest warrant was constitutionally sound for the seizure of the guns to be valid under the rule announced in *Buie*. *[Id.]()* (citing *[Buie]()*, [494 U.S. at 334]()). And it would make little sense if the Court, after holding that the arresting officers' objectively reasonable reliance on the deputy clerk's probable cause determination precluded suppression, proceeded to hold that the seizure of

12

firearms found in plain view during an ongoing arrest in the home of a suspected murderer required suppression.

### E.  Evidence Obtained from the Jaguar Vehicle

Finally, Defendant argues that the Task Force's search of the Jaguar before a search warrant was obtained was unconstitutional, and that the items obtained from the Jaguar pursuant to the later-obtained search warrant should be excluded as "fruit of the poisonous tree."  ECF No. 22 at PageID #: 72-75.  The Court agrees with the Government that, because Defendant is not charged with any evidence found in the Jaguar, the constitutionality of those searches is irrelevant.  ECF No. 26 at PageID #: 107 ("[T]he Government does not intend to use any of the evidence recovered in the Jaguar" and "it believes this issue is moot since no evidence found in the vehicle will be used during the Government's case in chief.").  Should the Government, at trial, attempt to introduce evidence obtained from the Jaguar, the Court will consider Defendant's arguments about the constitutionality of those searches before admitting such evidence.

### III. Conclusion

For the reasons explained above, Defendant's Motion is denied.


IT IS SO ORDERED.


____July 16, 2021____              ____/s/ Benita Y. Pearson_____
Date                               Benita Y. Pearson
                                   United States District Judge